IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

JENNIFER GOODE and KANDI FREY, )
individually, and on behalf of all others )
similarly situated, )
 )
          Plaintiffs, ) Case No. 17-CV-00472-GKF-JFJ
 )
v. )
 )
NUANCE COMMUNICATIONS, INC., )
and NUANCE TRANSCRIPTION )
SERVICES, INC., )
 )
          Defendants. )

## ORDER

This matter comes before the court on the Motion to Decertify Collective Action [Doc. 125] of defendants Nuance Communications, Inc. and Nuance Transcription Services, Inc. For the reasons set forth below, the motion is granted.

### I.    Background and Procedural History

Plaintiffs and members of the putative collective are current and/or former non-exempt medical transcriptionists, or medical language specialists ("MLS employees"), employed by Nuance Transcription Services, Inc., a wholly owned subsidiary of Nuance Communications, Inc. Plaintiffs filed this lawsuit alleging that defendants violated the Fair Labor Standards Acts, 29 U.S.C. §§ 203 *et seq.*, by failing to pay MLS employees for rest periods, resulting in an improper reduction of overtime pay for MLS employees who worked over forty hours in a workweek and remained clocked in for rest periods, and failing to pay overtime wages to MLS employees who clocked out for rest periods but worked forty hours in a workweek, including rest periods.

Additionally, plaintiffs assert FLSA violations for defendants' failure to timely pay promised incentives to MLS employees and to include the incentives when determining overtime pay.

In an Opinion and Order, dated July 23, 2018, the court conditionally certified as a collective action pursuant to 29 U.S.C. § 216(b), a class of plaintiffs limited to the following:

> Current and former MLS employees of Defendants who worked at any time during the period beginning **July 23, 2015, and ending July 23, 2018**:
>
> 1. Who were not compensated for rest periods and worked more than 40 hours in a workweek when the rest periods are included;
>
>    AND/OR
>
> 2. Who worked more than 40 hours in a workweek, inclusive of rest periods, and earned incentives during such workweeks that were not calculated into the overtime rate and/or were not paid on the regularly scheduled payroll date after the incentives were earned.

[Doc. 54]. The court approved the FLSA Conditional Certification Notice on August 7, 2018, which provided for an opt-in period of August 23, 2018 to October 22, 2018. [Doc. 57]. Over 800 persons joined as opt-in plaintiffs during the period.[1]

Defendants now move for decertification of the FLSA collective. [Doc. 125]. Plaintiffs responded [Doc. 142], and defendants timely filed a reply on December 20, 2019. [Doc. 146]. The court held a hearing on the motion on January 13, 2020, and the motion is now ripe for the court's review.[2]

---

[1] Two opt-in plaintiffs, Lorraine Long and Elaina Rand, elected to join prior to issuance of the Notice. [Doc. 24]. Further, although joined during the opt-in period, Magistrate Judge Jodi F. Jayne recommended that eleven (11) opt-in plaintiffs be dismissed with prejudice from the FLSA collective action for failure to participate in discovery. [Doc. 139]. The court adopted Magistrate Judge Jayne's Report and Recommendation and dismissed with prejudice those 11 opt-in plaintiffs from the FLSA collective action. [Doc. 145].

[2] A more complete procedural history of this matter can be found in Magistrate Judge Jayne's November 27, 2019 Report and Recommendation [Doc. 139], and this court's Opinion and Order,

## II. Standard of Review

Section 216(b) of the Fair Labor Standards Act permits collective actions brought for and in behalf of similarly situated employees:

> An action to recover the liability prescribed in the preceding sentences may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

29 U.S.C. § 216(b). The FLSA does not define "similarly situated." However, the Tenth Circuit previously endorsed the two-step *ad hoc* method of determination. *See Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1105 (10th Cir. 2001); *Chapman v. BOK Fin. Corp.*, No. 12-CV-613-GKF-PJC, 2013 WL 12032545, at *2 (N.D. Okla. Apr. 30, 2013).

Pursuant to the *ad hoc* approach, a court first "makes an initial 'notice stage' determination of whether plaintiffs are 'similarly situated[.]'" *Thiessen*, 267 F.3d at 1102. During this first stage, a finding of "similarly situated," "require[s] nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan." *Id.* (quoting *Vaszlavik v. Storage Tech. Corp.*, 175 F.R.D. 672, 678 (D. Colo. 1997)). Generally, district courts in this Circuit have limited the scope of their review at the notice stage of certification to the allegations in plaintiffs' complaint and supporting affidavits. *Shockey v. Huhtamaki, Inc.,* 730 F. Supp. 2d 1298, 1303 (D. Kan. 2010); *Smith v. Pizza Hut, Inc.*, No. 09-CV-01632-CMA-BNB, 2012 WL 1414325, at *3 (D. Colo. Apr. 21, 2012).

---

dated February 5, 2020, denying plaintiffs' Application to Amend the Second Amended Complaint and granting defendants' Motion to Strike Expert Report of Leah Wietholter. [Doc. 159].

The court then moves to the second stage. During this second stage, "[a]t the conclusion of discovery (often prompted by a motion to decertify), the court then makes a second determination, utilizing a stricter standard of 'similarly situated.'" *Thiessen*, 267 F.3d at 1102-03. Pursuant to this stricter analysis, "a court reviews several factors, including '(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; [and] (3) fairness and procedural considerations.'"[3] *Id.* at 1103. In the context of FLSA collectives, courts generally conclude "at th[e] second stage, the burden is on the Plaintiff to prove that the individual class members are similarly situated."[4] *Proctor v. Allsups Convenience Stores, Inc.*, 250 F.R.D. 278, 280 (N.D. Tex. 2008) (citing *Bayles v. Am. Med. Response of Colo., Inc.,* 950 F. Supp. 1053, 1062-63 (D. Colo. 1996); *Ellis v. Elgin Riverboat Resort*, 217 F.R.D. 415, 419 (N.D. Ill. 2003)); *see also Frye v. Baptist Mem'l Hosp., Inc.*, 495 F. App'x 669, 671 (6th Cir. 2012); *Kaiser v. At the Beach, Inc.*, No. 08-CV-586-TCK-FHM, 2010 WL 5114729, at *4 (N.D. Okla. Dec. 9, 2010). The decision of whether to decertify a collective action is generally within the district court's trial management discretion. *Thiessen*, 267 F.3d at 1105; *see also In re Chipotle Mexican Grill, LLC,* No. 17-1028, 2017 WL 4054144, at *2 (10th Cir. Mar. 27, 2017).

---

[3] Thiessen includes a fourth factor related to required filings under the ADEA that is not applicable to FLSA cases. *See Kaiser v. At the Beach, Inc.*, No. 08-CV-586-TCK-FHM, 2010 WL 5114729, at *4 n.9 (N.D. Okla. Dec. 9, 2010).

[4] The parties disagree as to the party that bears the burden with respect to the "similarly situated" inquiry. Defendants contend that plaintiffs bear the burden to demonstrate that the named plaintiffs and opt-in plaintiffs are "similarly situated" so as justify continued certification. Plaintiffs, however, assert that, although they bear the burden to "come forward with the evidence" that individual class members are similarly situated, because defendants filed the motion to decertify, defendants bear the burden of persuasion. [Doc. 142, pp. 25-26]. Plaintiffs rely on *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49 (2005). However, in *Schaffer,* the Court considered the burden of proof with respect to an IDEA statutory cause of action. Therefore, *Schaffer* is distinguishable. The court looks to cases considering the burden in the context of FLSA collective actions.

**III.   Decertification Analysis**

As previously stated, the court conditionally certified an FLSA collective inclusive of two separate factual theories.  *First*, MLS employees who claim defendants improperly reduced their overtime pay by requiring defendants to remain clocked in during rest periods, or who did not include rest periods in the overtime calculation if the MLS employees clocked out.[5]  *Second,* MLS employees who claim defendants failed to timely pay promised incentives to them and to include the incentives to determine overtime pay.

The issue before the court is whether the named plaintiffs and opt-in plaintiffs are "similarly situated" within the meaning of 29 U.S.C. § 216(b), such that it would be appropriate to proceed to trial on all of the claims together.  To make the "similarly situated" determination, the court examines the factors discussed in *Thiessen*.

    *A.   Disparate Factual and Employment Settings of the Individual Plaintiffs*

With respect to this first factor, at the second stage, "[w]hile the plaintiffs must show that they are 'similarly situated,' this does not mean they must establish they are 'identically situated.'" *Proctor*, 250 F.R.D. at 280 (citing *Basco v. Wal-Mart Stores, Inc.*, No. CIV-A-00-3184, 2004 WL 1497709, at *5 (E.D. La. July 2, 2004)).  The relevant inquiry is "if there is 'a demonstrated similarity among the individual situations . . . some factual nexus which binds the named plaintiffs

---

[5] In the response to the motion to decertify, plaintiffs state: "Named Plaintiffs' and the Opt-Ins' (together 'Plaintiffs') claims center around Nuance's policies requiring that they perform certain nonproductive tasks (*administrative tasks* and rest breaks), without pay, while clocked-in to Nuance's timekeeping system as performing production tasks (transcribing). These policies dilute Plaintiffs' production compensation, and thereby reduced their regular rate for calculating overtime." [Doc. 142, p. 7].  However, the Second Amended Complaint, the operative pleading in this case, includes no allegations relative to administrative tasks or nonproductive time generally.  *See* [Doc. 29].  For the reasons discussed in its February 5, 2020 Opinion and Order, the court denied plaintiffs' motion for leave to amend.  [Doc. 159].  Thus, administrative time is not at issue in this litigation.

and the potential class members together as victims of a particular alleged [policy or practice].'" *Id.* (quoting *Heagney v. European Am. Bank*, 122 F.R.D. 125, 127 (E.D.N.Y. 1988)). "The need for individual factual determinations is not fatal to certification of a FLSA collective action." *Chapman*, 2014 WL 3734271, at *2. However, "the more material distinctions revealed by the evidence, the more likely the district court is to decertify the collective action." *Proctor*, 250 F.R.D. at 281 (quoting *Anderson v. Cagle's, Inc.*, 488 F.3d 945, 953 (11th Cir. 2007)).

Defendants argue that distinct questions of proof necessary to liability—specifically dissimilarities in the way that policies affected the plaintiffs—require decertification. In response, plaintiffs argue that defendants' common policies are sufficient to establish that plaintiffs are "similarly situated" for purposes of § 216(b). The court first considers this factor with respect to the rest period theory, and then the incentive pay theory.

1. Rest Periods

Plaintiffs present evidence of the existence of a common policy with respect to rest periods. Effective September 26, 2015, the Update to Nuance Transcription Services Employee Handbook ("Handbook Update") required MLS employees who worked more than 3.5 hours in a day to take one 15-minute rest period (break) per four (4) hours worked. [Doc. 125-1, p. 2; Doc. 144-16, p. 2]. The policy required pay for the rest periods and that the compensation for rest periods be included in the calculation of overtime pay. [*Id.*]. Although the Handbook Update does not explicitly require MLS employees to remain clocked into the WebClock "Production Code"[6] during their rest periods, in the motion to decertify, defendants concede that most MLS employees

---

[6] During the relevant period, MLS employees tracked their time using a program called "WebClock." On a typical day, MLS employees "punch" into WebClock using the task code "MT Production Hours – Regular." When ready to start transcribing, the MLS employees then log into a separate transcription platform to begin production. [Doc. 144-27].

were required to remain clocked in. [Doc. 125, p. 10]. The Handbook Policy provided an exception for California MLS employees, who were required to provide Nuance notice of their intent to take rest periods by clocking out of WebClock task "Production" and clocking into the WebClock task "Rest Break."[7] [Doc. 144-16, p. 2]. Further, in December of 2014, Nuance implemented the "Patient Safety Compensation Plan" to determine the compensation owed to its MLS employees. [Doc. 143-19]. All MLS employees were paid pursuant to the Patient Safety Compensation Plan.

In light of the asserted common policy, plaintiffs urge the court to rely on *Kaiser v. At the Beach, Inc.*, a decision by another court in this district. 2010 WL 5114729 (N.D. Okla. Dec. 9, 2010). In *Kaiser*, U.S. District Judge Terence Kern certified a collective action of twenty-six (26) individuals who were former or current At the Beach managers and did not receive overtime pay because they were misclassified as exempt from FLSA's overtime requirements. *Id.* at *5. In so doing, the court noted that there were no significant factual disparities in the original plaintiffs—despite the fact that some plaintiffs clocked in and clocked out while others did not—because the alleged wrong was the decision *to classify* plaintiffs as exempt. *Id.* at *6.

Here, it is clear that, unlike in *Kaiser*, material differences exist between the factual circumstances surrounding each plaintiffs' treatment under defendants' policy that weigh against collective treatment. During class certification discovery, defendants deposed the two named plaintiffs—Goode and Frey—and eight (8) opt-in plaintiffs: Brenda Barker, Nikki Cormier, Susan

---

[7] Plaintiffs submit some evidence in the form of deposition testimony that the rest periods were always mandatory—specifically the depositions of Stacey Chapman and Melissa Dawson, 30(b)(6) representatives, as well as Lynn Gilley, former director of human resources. However, the deposition testimony is apparently contradicted by the language of the Nuance Employee Handbook for the period prior to September 26, 2015. [Doc. 144-9, p. 19]. Regardless, the Employee Handbook in effect prior to September 26, 2015 also required that rest periods, if taken, be paid and that employees remain clocked in to the "Production Code." [*Id.*].

Sharifie, Deborah Boudreau, Cheryl Atwood, Kimberly Byers, Carol Pecena, and Lonette Worthey. Five of the plaintiffs (Barker, Cormier, named plaintiff Goode, Sharifie, Boudreau) testified that it was their usual practice to take breaks; three (Atwood, Byers, and Pecena) testified that whether or not they took a break depended on the amount of work available; and two (named plaintiff Frey and Worthey) testified that they did not take breaks. Amongst the eight plaintiffs that took breaks, whether regularly or occasionally, only Goode testified that she took the full thirty (30) minutes available to her. Some testified that they typically took short breaks (Barker, Sharifie, Pecena), while others testified that the length of their breaks varied (Cormier, Atwood, Byers). Boudreau and Goode, neither of whom resided in California, specifically testified that they clocked out during the relevant period, which was contrary to Nuance policy.[8] Class discovery does not account for the California opt-in plaintiffs, the subject of a state-specific policy.

Decertification is appropriate when discovery shows that the relevant company policy did not affect plaintiffs "equally or in the same manner." *See, e.g., Brechler v. Qwest Commc'ns Int'l, Inc.*, No. 06-00940-PHX-ROS, 2009 WL 692329, at *3 (D. Ariz. Mar. 17, 2009). Here, it is clear that, although named plaintiffs and the opt-in plaintiffs may have been subject to the same policy, significant factual disparities exist as to how that policy affected plaintiffs. *See Proctor,* 250 F.R.D. at 280 (quoting *Heagney,* 122 F.R.D. at 127) ("[T]he question is if there is 'a demonstrated similarity among the individual situations . . . some factual nexus which binds the named plaintiffs and the potential class members together as victims of a particular alleged [policy or practice].'"); *see also Anderson,* 488 F.3d at 953 (internal citation omitted) (quoting *White v. Osmose, Inc.*, 204 F. Supp. 2d 1309, 1314 (M.D. Ala. 2002)) ("[A]lthough the FLSA does not require potential class

---

[8] Goode testified that she originally stayed clocked in, but, "probably" in 2017, started clocking out. [Doc. 125-5, p. 102:11-18]. Thus, Goode did not remain clocked in as required by the policy for at least part of the collective period.

members to hold identical positions, the similarities necessary to maintain a collective action under § 216(b) must extend 'beyond the mere facts of job duties and pay provisions.'").

Most significant to this court, it appears that the *named plaintiffs* were not affected by the rest period policy as asserted in the Second Amended Complaint. Rather, Goode testified that she began clocking out for rest periods "probably in 2017," which was contrary to Nuance policy. [Doc. 125-5, p. 102:3-18]. Frey testified that she generally did not take rest breaks. [Doc. 125-12, pp. 51:9 to 52:7]. Thus, the disparate factual circumstances surrounding each plaintiffs' conduct under the rest period policy—and, significantly, that of the named plaintiffs—weigh against a conclusion that plaintiffs and opt-in plaintiffs are "similarly situated." *See O'Brien v. Ed Donnelly Enters., Inc.*, 575 F.3d 567, 586 (6th Cir. 2009).

In the face of evidence that some plaintiffs did not take breaks, took breaks of varying lengths, or clocked out during their breaks contrary to Nuance policy, plaintiffs contend that these issues bear on damages, not whether plaintiffs and "opt-in" plaintiffs are "similarly situated." *See Underwood v. NMC Mortg. Corp.*, No. 07-2268-EFM, 2009 WL 1322588, at *4 (D. Kan. May 11, 2009) (need for individualized inquiry to determine hours of overtime worked and if plaintiffs were appropriately compensated was not sufficient to defeat collective action); *Lozoya v. All Phase Landscape Constr., Inc.*, No. 12-CV-1048-JLK, 2014 WL 222104, at *2 (D. Colo. Jan. 21, 2014). Plaintiffs allege that "[t]he alleged varying clocking practices only create an issue of where to find that missing time in Nuance's data." [Doc. 142, p. 30]. Plaintiffs assert that all non-productive time spent clocked-in is captured in "Server Variance" time, "which multiplied at the appropriate [Average Hourly Rate] is the measure of lost straight-time pay for those that followed Nuance policies." [*Id.*]. Plaintiffs state that the unpaid straight-time need only be valued at a new Average Hourly Rate per pay period, added back to total pay, and then divided by total hours less than 40

captured by WebClock to arrive at a new Effective Hourly Rate to value any overtime hours during that pay period. [*Id.*].

Plaintiffs' proposed method captures *all* non-productive time, including ten to twenty minutes at the beginning of each shift in which MLS employees are obligated to review Feedback Action Notifications, Corrections Reports, check email, etc. [Doc. 144-27]. Such non-productive, administrative time is not at issue in this lawsuit and therefore plaintiffs' proposed method is improper.[9]

Further, contrary to plaintiffs' assertions, the factual disparities are relevant to the issue of *liability*, as well as damages. Liability under plaintiffs' theory requires plaintiffs to demonstrate that they took rest periods of a short duration, running from 5 to 20 minutes, that were included in the calculation of their regular rate of pay, resulting in an artificial reduction of their regular rate of pay and therefore overtime rate. *See generally* 29 C.F.R. § 785.18. Plaintiffs offer no evidence that the "Server Variance" time may be sorted into rest period time, administrative time, or other non-productive time absent individualized inquiry. Class certification discovery demonstrates that rest period practices amongst the named plaintiffs and opt-in plaintiffs differed significantly. Additionally, as recognized by the plaintiff's counsel during the hearing on the motion to decertify, "those [administrative] tasks are not going to be uniform day to day." [Doc. 150, pp. 18:25 to 19:1]. In fact, it is conceivable that all of the "Server Variance" time in one day could be attributed solely to administrative time. Further, the "Server Variance" time could include breaks of a

---

[9] Further, overtime payment for such administrative, nonproductive time, if it at issue, could potentially implicate other considerations such as whether defendants and MLS employees reached an agreement with respect to the treatment of that time in the overtime computation, which could, itself, constitute a separate policy. *See* 29 C.F.R. § 778.18; [Doc. 142, p. 23]. This also suggests disparate factual circumstances.

duration longer than thirty (30) minutes, which is not compensable under the FLSA.[10] Finally, the evidence demonstrates that some plaintiffs (including Goode beginning in 2017) did not follow the policy and, if fact, logged out during rest periods, and the policy for California MLS employees *required* the employees to log out. For those plaintiffs, the "Server Variance" time would not capture time spent on rest periods. Rather, the court would have to look to the plaintiffs' WebClock punches, a completely separate inquiry. *See* [Doc. 150, p. 46:13-21]. Plaintiffs offer no expert testimony interpreting either the "Server Variance" or "WebClock" data.[11]

For the foregoing reasons, it is clear that proving liability—that is, that each plaintiff took rest periods of a short duration which were included in the calculation of the overtime rate of pay so as to artificially reduce the overtime rate—would force the proceedings to "devolve into numerous mini-trials, causing the jury to evaluate testimony from countless witnesses and other evidence that is unique to particular Plaintiffs, and thus incompatible with collective actions." *Blair v. TransAm Trucking, Inc.*, 309 F. Supp. 3d 977, 1010 (D. Kan. 2018) (quoting *Green v. Harbor Freight Tools USA, Inc.*, 888 F. Supp. 2d 1088, 1104 (D. Kan. 2012)).[12] The first *Thiessen* factor therefore weighs strongly in favor of decertification as to the rest period theory.

---

[10] Because this issue relates to the merits of plaintiffs' claims, the issue is inappropriate for resolution at the decertification stage. *Kaiser*, 2010 WL 5114729, at *4.

[11] On January 13, 2020, plaintiffs' counsel disclosed the expert report of Leah Wietholter, of Workman Forensics, a damages expert, but Wietholter's report was limited to use "in support of Plaintiffs' Motion for Class Certification Under FRCP 23." [Doc. 151-5]. Further, the court struck the report. [Doc. 159].

[12] For this reason, the U.S. Supreme Court's decision in *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946), is inapplicable. Plaintiffs are entitled to a "reasonable inference" as to the extent of damages only after plaintiffs meet their initial burden of proving that they performed work for which they were not properly compensated. *Anderson* primarily relates to the relaxed burden to prove exact damages, not a relaxed burden to demonstrate that a sufficient factual nexus exists between named plaintiffs and opt-in plaintiffs to bind them to a common policy for purposes of collective action.

2. <u>Incentive Pay</u>

With respect to the incentive pay theory, on June 27, 2017, a malware attack affected defendants' electronic communications and timekeeping systems, as well as certain transcription platforms, rendering MLS employees who worked on those platforms unable to work in their normal course. Defendants restored some platforms within a few days, but was unable to restore all systems for several weeks. In the interim, defendants implemented an incentive compensation plan for MLS employees. [Doc. 49-1, p. 6].

Pursuant to the incentive plan, MLS employees who worked during the period from June 27, 2017 through July 7, 2017 were eligible to receive:

- Pay for the first 8 hours worked daily at the rate of 1.5 x hours worked x Average Hourly Rate (AHR)
- Pay for hours worked in excess of 8 hours daily at the rate of 2.0 x hours worked x AHR
- An additional $1,000 bonus paid to employees who had at least 40 productive hours within five consecutive days

[Doc. 125-17]. The $1,000 bonus was discontinued on July 8, 2017. [Doc. 125-18]. The offer of pay for hours worked in excess of 8 hours daily at the rate of 2.0 was discontinued for the pay period from July 7, 2017 to July 14, 2017. Defendants resumed paying production hours at AHR for the payroll week ending on July 21, 2017. [Doc. 125-19].

Plaintiffs fail to provide evidence of "some factual nexus which binds the named plaintiffs and the potential class members together as victims of a particular alleged [policy or practice.]" *Proctor,* 250 F.R.D. at 280. Rather, of the deposed plaintiffs, two (Worthey and Cormier) admitted that they had no claim with respect to the incentive plan. Barker testified that she had no reason to believe that she was entitled to more. And of the five deposed plaintiffs who asserted that they were owed something, each had different theories as to why. Atwood stated that she was owed something, but she was not sure what. Boudreau asserts she was not paid the $1,000 incentive.

Byers alleges that she was paid a rate that was too low after the malware attack. Frey alleges that defendants did not pay her the correct amount for her 1.5 and 2.0 times per line. Goode admits that she was not entitled to the incentive payment, but was paid it anyway. She complains that the payment was late.

Plaintiffs fail to satisfy their burden to establish that defendants implemented a "uniform, systematically applied policy of wrongfully denying" incentive pay. *Proctor,* 250 F.R.D. at 281. It would be impossible to extrapolate liability to the entire collective based on the evidence. Rather, determining liability would cause the proceedings to "devolve into numerous mini-trials." Accordingly, this first factor weighs strongly in favor of decertification as to the incentive pay theory.

  B. *Individualized Defenses*

Individualized defenses do not always require decertification. *Chapman*, 2014 WL 3734271, at *2; *Lozoya,* 2014 WL 222104, at *3. However, decertification is appropriate when the individualized defenses "inhibit the efficiency of proceedings on a collective basis" and "make the class unmanageable." *Green.*, 888 F. Supp. 2d at 1103.

Defendants contend that at least four individualized defenses require decertification: (1) release of claims through severance agreements; (2) statute of limitations; (3) California MLS employees employed after defendants required California employees to clock out into a separate rest break code and paid those employees separately for that time; and (4) opt-in plaintiffs whose testimony demonstrates that they have no valid claim.[13]

---

[13] The same analysis applies with respect to the rest period and incentive pay theories.

*First*, as to release, defendants contend that more than one hundred plaintiffs released their FLSA claims in exchange for severance payments. The Supreme Court has recognized that "FLSA rights cannot be abridged by contract or otherwise waived." *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 740 (1981). Thus, courts have split as to whether FLSA claims may be settled privately without court or the Department of Labor involvement. *See Sims v. Hous. Auth. of the City of El Paso,* No. 10-CV-109-KC, 2011 WL 3862194, at *6 (W.D. Tex. Sept. 1, 2011). However, those courts that permit settlement only do so where a *bona dispute* existed between the parties as to the number of hours worked or compensation due. *Id.* Courts also generally require that the employee at issue not be an unrepresented worker, unaware of FLSA rights. *Gorczyca v. NVR, Inc.,* No. 13-CV-6315-L, 2017 WL 11435971, at *2 (W.D.N.Y. July 13, 2017). Resolution of whether the severance agreements effectively preclude the one hundred plaintiffs' claims is inappropriate at the decertification stage. *Kaiser*, 2010 WL 5114729, at *4. In any event, the defense would be specific to over ten percent (10%) of the opt-in class, and, if applicable, would require an individualized factual inquiry that would inhibit the efficiency of proceeding on a collective basis. *See Schueler v. H&R Block Mortg. Corp.*, No. CV-07-00342-CJC(MLGx), 2009 WL 10671973, at *4 (C.D. Cal. Aug. 10, 2009).

*Second*, with respect to statute of limitations, courts are split as to whether a statute of limitations defense requires decertification. *Cf. White v. Baptist Mem'l Health Care Corp.*, No. 08-2478, 2011 WL 1883959, at *12 (W.D. Tenn. May 17, 2011) (did not require certification); *Arnold v. DirecTV, LLC*, No. 10-CV-352-JAR, 2017 WL 1251033, at *8 (E.D. Mo. Mar. 31, 2017) (statute of limitations is individualized defense). In this case, defendants assert that only seventeen (17) plaintiffs are subject to the statute of limitations defense. The court is not persuaded that consideration of this issue would make collective action unmanageable.

*Third,* defendants contend that four (4) opt-in plaintiffs reside in California and were employed after defendants required California MLS employees to clock out into a separate rest break code and paid those employees separately for that time. Resolution of this defense with respect to four opt-in plaintiffs would not make management of this case as a collective unmanageable.

*Fourth*, resolution of the claims of the deposed plaintiffs who admitted to taking no rest breaks and were not employed during the malware incident would not render collective action unmanageable. For the foregoing reasons, the individualized defenses factor does not weigh strongly either in favor of or against decertification.

    C.    *Fairness and Procedural Considerations*

With respect to fairness and procedural considerations, the court should bear in mind the primary objectives of a § 216(b) collective action: "(1) to lower costs to the plaintiffs through the pooling of resources; and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arose from the same alleged activity." *Blair,* 309 F. Supp. 3d at 1012. This includes whether the facts are so individualized that it would be impossible to continue with representative testimony.[14] *Id.*

As an initial matter, the court notes that plaintiffs disclaim any intent to rely on representative testimony, and instead, intend to rely on "common evidence" of a uniform policy and an *Anderson* inference that they are owed compensation for work performed. [Doc. 142, pp. 37-38]. However, for the reasons discussed above, the *Anderson* inference is inapplicable. Mere evidence of a common policy, alone, is insufficient to satisfy plaintiffs' initial burden of proving

---

[14] As with the second factor, the same analysis applies with respect to the rest period and incentive pay theories.

that they performed work for which they were not properly compensated. Plaintiffs propose no other workable trial plan. Thus, the court considers the potential for representative testimony.

Courts have recognized that "[a] representative sample of employees can provide the proof of a prima facie case of a FLSA violation." *Proctor*, 250 F.R.D. at 283 (citing *Reich v. S. New England Telecomms. Corp.,* 121 F.3d 58, 67 (2d Cir. 1997)). However, "[t]he use of representative testimony is justified only where it is reasonable to believe that the testifying witnesses' experiences are sufficiently similar to those of the rest of the non-testifying plaintiffs." *Arnold*, 2017 WL 1251033, at *7 (quoting *Roussell v. Brinker Int'l, Inc.*, CIV-A-H-05-3733, 2008 WL 2714079, at *22 (S.D. Tex. July 9, 2008)). "Where a purported unlawful policy impacts Plaintiffs in different and individual ways, 'there is not one single decision, policy, or plan but rather multiple policies that require decertification.'" *Id.*

As discussed above, here, the two named plaintiffs are not "representative" of the "opt-in" plaintiffs. With respect to the rest period theory, Frey testified that she did not take rest periods and Goode testified that she began clocking out for her rest periods "probably in 2017," contrary to Nuance policy. As for the incentive pay theory, Frey alleges that defendants did not pay her the correct amount for her 1.5 and 2.0 times per line, whereas Goode made no allegations with respect to her line pay, and admits that she was not entitled to the incentive payment, but was paid it anyway. Further, as to both theories, amongst the opt-in plaintiffs deposed, the testimony varies. The factual disparities render proceeding with representative testimony difficult, if not impossible.

Further of significance, it is clear that a determination of damages would require an individualized inquiry. There are over 800 opt-in plaintiffs. Plaintiffs present no expert testimony with respect to damages, nor do they offer any workable theory as to how damages could be efficiently calculated. Thus, a damage determination would require this court to conduct over 800

individualized inquiries to resolve factual disputes related to the amount of damages owed each plaintiff. That is neither efficient nor manageable.

For the foregoing reasons, fairness to both parties—to present evidence as to liability and the appropriate measure of damages—strongly weighs in favor of decertification.[15]

D.   *Summary*

To determine whether the MLS employees are "similarly situated," the court applies three factors "under a relatively strict standard." *Blair,* 309 F. Supp. 3d at 1013. The majority of the factors strongly weigh in favor of decertification. A determination of liability will require over eight hundred highly individualized and fact-specific inquires, as would damages. Plaintiffs offer no workable trial plan. Thus, proceeding as a collective is neither manageable nor efficient, and does not further the objectives of a § 216(b) collective action. Decertification is warranted.

## VI.   Conclusion

WHEREFORE, the Motion to Decertify Collective Action [Doc. 125] of defendants Nuance Communications, Inc. and Nuance Transcription Services, Inc. is granted. The court decertifies the collective action and dismisses the opt-in plaintiffs without prejudice. To avoid prejudice to the opt-in plaintiffs who may choose to file their own cases, the court invokes its equity power to toll the applicable statute of limitations for forty-five (45) days following the issuance of this order. The case remains pending as to the individual claims of the named plaintiffs, Jennifer Goode and Kandi Frey.

IT IS SO ORDERED this 14th day of February, 2020.

GREGORY K. FRIZZELL
UNITED STATES DISTRICT JUDGE

---

[15] To that end, plaintiffs have benefitted from the class discovery conducted in advance of this motion. *Green,* 888 F. Supp. 2d at 1104; *Goodly,* 2018 WL 5724320, at *4.