IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

JENNIFER GOODE and KANDI FREY, )
individually, and on behalf of all others )
similarly situated, )
 )
               Plaintiffs, )    Case No. 17-CV-00472-GKF-JFJ
 )
v. )
 )
NUANCE COMMUNICATIONS, INC., )
and NUANCE TRANSCRIPTION )
SERVICES, INC., )
 )
               Defendants. )

**ORDER**

This matter comes before the court on the Motion for Certification of a Class Under Fed. R. Civ. P. 23 [Doc. 165] of plaintiffs Jennifer Goode and Kandi Frey. For the reasons set forth below, the motion is denied.

**I.**    **Background and Procedural History**

On August 25, 2017, plaintiff Jennifer Goode initiated this case on behalf of herself and members of the putative class, all of whom are current and/or former non-exempt medical transcriptionists, or medical language specialists ("MLS employees"), employed by Nuance Transcription Services, Inc., a wholly owned subsidiary of Nuance Communications, Inc. [Doc. 2]. The Second Amended Complaint, the operative pleading, included four causes of action: (1) failure to provide compensation for mandated rest periods under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*; (2) violation of the Massachusetts Payment of Wages Act, Mass. Gen. Laws ch. 149, § 148 *et seq.* and the Massachusetts Overtime Law, Mass. Gen. Laws

ch. 151, § 1A *et seq*.; (3) breach of contract; and (4) fraud.[1]  Defendants moved to dismiss the Massachusetts statutory wage and overtime claim and fraud claim [Doc. 42], and the court granted the motion. [Doc. 51].  Thus, only the FLSA and breach of contract claims remain.

Plaintiffs' remaining claims are premised on two separate factual bases:  (1) rest breaks and (2) incentive payments.[2]  With respect to the rest break theory, effective September 26, 2015, the Update to Nuance Transcription Services Employee Handbook required MLS employees who worked more than 3.5 hours in a day to take one 15-minute rest period (break) per four (4) hours worked.  The policy required pay for the rest periods and that the compensation for rest periods be included in the calculation of overtime pay.  MLS employees, except those in California, were required to remain clocked in to WebClock, an electronic timekeeping software, during their rest periods.  In December of 2014, Nuance implemented the "Patient Safety Compensation Plan" to determine the compensation owed to its MLS employees.  All MLS employees were to be paid pursuant to the Patient Safety Compensation Plan.

As for the incentive payment theory, on June 27, 2017, a malware attack affected defendants' electronic communications and timekeeping systems, as well as certain transcription platforms, rendering MLS employees who worked on those platforms unable to work in their normal course.  Defendants restored some platforms within a few days, but were unable to restore all systems for several weeks.  In the interim, defendants implemented an incentive compensation

---

[1] Plaintiff Kandi Frey was added as a named plaintiff to the First Amended Complaint, filed on September 14, 2017.  [Doc. 9].

[2] Defendants' rest break policy, as well as the malware incentive communications, are described in greater detail in the court's Order regarding decertification of the FLSA collective, dated February 14, 2020.  [Doc. 170].

plan for MLS employees.  Pursuant to the incentive plan, MLS employees who worked during the period from June 27, 2017 through July 7, 2017 were eligible to receive:

- Pay for the first 8 hours worked daily at the rate of 1.5 x hours worked x Average Hourly Rate (AHR)
- Pay for hours worked in excess of 8 hours daily at the rate of 2.0 x hours worked x AHR
- An additional $1,000 bonus paid to employees who had at least 40 productive hours within five consecutive days

The $1,000 bonus was discontinued on July 8, 2017.  The offer of pay for hours worked in excess of 8 hours daily at the rate of 2.0 was discontinued for the pay period from July 7, 2017 to July 14, 2017.  Defendants resumed regular payment of production hours during the payroll week ending on July 21, 2017.

With respect to the FLSA claim, this court conditionally certified a collective action pursuant to 29 U.S.C. § 216(b), a collective of plaintiffs limited to the following:

> Current and former MLS employees of Defendants who worked at any time during the period beginning **July 23, 2015, and ending July 23, 2018**:
>
> 1. Who were not compensated for rest periods and worked more than 40 hours in a workweek when the rest periods are included;
>
> AND/OR
>
> 2. Who worked more than 40 hours in a workweek, inclusive of rest periods, and earned incentives during such workweeks that were not calculated into the overtime rate and/or were not paid on the regularly scheduled payroll date after the incentives were earned.

[Doc. 54].  However, in an Order, dated February 14, 2020, the court decertified the FLSA collective action and dismissed the opt-in plaintiffs without prejudice.  [Doc. 170].

Plaintiffs now moves for class certification pursuant to Fed. R. Civ. P. 23 on the breach of contract claim.  Plaintiffs define the proposed class as follows:

> All current and former MLSs who worked for Nuance Transcription Services, Inc. and Nuance Communications, Inc. at any time during the period August 25, 2011 to the present:

> 1. Who worked sufficient hours to meet the standards of Nuance's MLS rest breaks policy;
>
> AND/OR
>
> 2. Who worked sufficient hours during the period June 25, 2017 through August 15, 2017 to meet the standards for Nuance's bonus compensation related to Nuance's 2017 malware incident.
>
> Excluded from the Class claims are the rest break claims of any MLS that worked in California accruing after September 27, 2015.

[Doc. 165, p. 33].

## II.     Standard of Review

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979)). "In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *D.G. ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1194 (10th Cir. 2010) (quoting *Shook v. El Paso Cty.*, 386 F.3d 963, 971 (10th Cir. 2004))  This court "must undertake a 'rigorous analysis' to satisfy itself that a putative class meets the applicable Rule 23 requirements." *Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 913 (10th Cir. 2018) (citing *CGC Holding Co. v. Broad & Cassel*, 773 F.3d 1076, 1086 (10th Cir. 2014)).  This is because "Rule 23 does not set forth a mere pleading standard.  A party seeking class certification must affirmatively demonstrate [her] compliance with the Rule—that is, [she] must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc.*, 564 U.S. at 350 (emphasis in original).

Rule 23(a) sets forth four threshold requirements:

> (1) the class is so *numerous* that joinder of all members is impracticable;

> (2) there are questions of law or fact *common to the class*;
>
> (3) the claims or defenses of the representative parties are *typical* of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and *adequately protect* the interests of the class.

*CGC Holding Co.*, 773 F.3d at 1086 (emphasis in original) (quoting Fed. R. Civ. P. 23(a)). "A party seeking class certification must show 'under a strict burden of proof' that all four requirements are clearly met." *Trevizo v. Adams*, 455 F.3d 1155, 1162 (10th Cir. 2006) (quoting *Reed v. Bowen,* 849 F.2d 1307, 1309 (10th Cir. 1988)).

In addition to the four threshold requirements of Rule 23(a), "[t]he party must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b)." *Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc.*, 725 F.3d 1213, 1217 (10th Cir. 2013) (quoting *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013)). Plaintiffs seek certification pursuant to Rule 23(b)(3), which requires the court to find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *see also XTO Energy, Inc.*, 725 F.3d at 1217 (internal quotations omitted) (emphasis added) ("Rule 23(b)(3) . . . requires the court to find that: (1) questions of law or fact common to class members predominate over any questions affecting only individual members, (*predominance*); and (2) a class action is superior to other available methods for fairly and efficiently adjudicating the controversy (*superiority*)."). Matters pertinent to these findings include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;

> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).[3]

## III. Class Certification Analysis

As previously mentioned, plaintiffs request the court grant Rule 23 certification on the breach of contract claim. Defendants argue that the putative class fails to satisfy Rule 23(a)'s requirements for commonality, typicality, or Rule 23(b)'s requirements of predominance and superiority.[4] For the reasons discussed, below the court concludes that plaintiffs fail to satisfy

---

[3] Defendants argue that, pursuant to the "law of the case" doctrine, "[b]ecause Plaintiffs have failed to meet the less demanding standard for maintaining certification of their collective action of the FLSA, they cannot prevail under the more demanding Rule 23 standard given the similarity in the factual basis for the claims." [Doc. 171, p. 18]. The court declines to apply the "law of the case" doctrine to determine the Rule 23 inquiry for two reasons. First, as previously stated, the Tenth Circuit requires the court to "undertake a 'rigorous analysis' to satisfy itself that a putative class meets the applicable Rule 23 requirements." *Menocal*, 882 F.3d at 913. Second, the Second Circuit decision relied on by defendants is factually distinguishable and therefore not persuasive. *See* [Doc. 171, p. 18 (citing *Myers v. Hertz Corp.*, 624 F.3d 537, 545 (2d Cir. 2010))]. In *Myers*, after transfer of the case to a new judge, the plaintiffs sought to use the Rule 23 motion as a vehicle to revisit substantive decisions on issues such as standing made by the case's original judge. *See Myers*, 624 F.3d at 545 ("Plaintiffs' counsel indicated to the district court that the class certification motion would be used as a vehicle to get [the first judge's] earlier rulings, and in particular the Collective Action Ruling, before this Court on an interlocutory basis if the district court were to deny the motion."). The district court did not apply the law of the case doctrine to wholly circumvent a Rule 23 analysis. Thus, the court will conduct an independent Rule 23 analysis, but may refer to its discussion of the evidence in earlier orders, including the February 14 Order on defendants' motion to decertify the FLSA collective.

[4] In the response, defendants do not contest the numerosity or adequacy of representation requirements. [Doc. 171].

their burden with respect to the Rule 23(b) requirements for predominance and superiority and therefore class certification is inappropriate.[5]

Rule 23(b)(3)'s predominance requirement mandates that "the questions of law or fact common to class members *predominate over* any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3) (emphasis added). The predominance determination "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation," *CGC Holding Co.*, 773 F.3d at 1087 (quoting (*Amchem Prods., Inc.*, 521 U.S. at 622-23), and "asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Id*. (quoting 2 William B. Rubenstein et al., Newberg on Class Actions § 4:49 (5th ed. 2012)).

> Common questions do not predominate if "a great deal of individualized proof" would need to be introduced or "a number of individualized legal points" would need to be established after common questions were resolved. Nor do common questions predominate if, "as a practical matter, the resolution of . . . [an] overarching common issue breaks down into an unmanageable variety of individual legal and factual issues."

2 William B. Rubenstein et al., Newberg on Class Actions § 4:50 (5th ed. 2019). Thus, the court "must first '*characterize* the issues in the case as common or not, and then *weigh* which issues predominate.'" *Naylor Farms, Inc.*, 923 F.3d at 789 (quoting Newberg on Class Actions, § 4:50). To make the determination, "merits questions may be considered to the extent—but only to the

---

[5] Because the court concludes that plaintiffs' failure to satisfy their evidentiary burden as to the requirements of Rule 23(b)(3) is dispositive, the court does not consider whether plaintiffs satisfy the threshold requirements of Rule 23(a). *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 610 (1997) (recognizing that "Rule 23(a)(2)'s 'commonality' requirement is subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class 'predominate over' other questions"); *Naylor Farms, Inc. v. Chaparral Energy, LLC*, 923 F.3d 779, 789 (10th Cir. 2019) (quoting *Comcast Corp.*, 569 U.S. at 34 ("Rule 23(b)(3)'s predominance requirement is related to, albeit 'more demanding than,' Rule 23(a)(2)'s commonality requirement.").

extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 133 S. Ct. 1184, 1195 (2013) (quoting *Wal-Mart Stores, Inc.*, 564 U.S. at 351 n.6).

Common Issues of Law Do Not Predominate

In order to prevail under their breach of contract theory, it is fundamental that plaintiffs must first establish the existence of a contract. Plaintiffs point to the Nuance Employee Handbook, policy statements, and other written communications as giving rise to an implied contract to compensate for rest breaks and promised incentives. [Doc. 165, p. 32; Doc. 29, pp. 19-21]. Defendants argue that plaintiffs' theory requires application of the laws of the various states in which the plaintiffs and putative class members resided and worked—at least 48 different states. *See* [Doc. 168-20]. "In a multi-state class action, variations in state law may swamp any common issues and defeat predominance." *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 741 (5th Cir. 1996). Thus, the court must conduct a preliminary choice-of-law analysis. *See Simon v. Metro. Prop. & Cas. Ins. Co.*, No. CIV-08-1008-W, 2012 WL 12931425, at *4 (W.D. Okla. Jan. 12, 2012); *see also Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821 (1985).

Plaintiffs first argue that "[t]here is no conflict in the laws of the 50 states that the employment relationship between the Class and Defendants is a contractual one and that the Employee Handbook and other written policy statements of Nuance create contractual rights." [Doc. 165, p. 26]. In support, plaintiffs cite to decisions from only five states, an over twenty-year old D.C. Circuit Court of Appeals decision collecting cases from four states regarding disclaimers of contract status, and two law review articles.[6] [Doc. 165, pp. 19-20]. This is insufficient. The

---

[6] In the reply, plaintiffs argue that "[d]efendants have not identified an actual conflict in the law of the 50 states." [Doc. 172, p. 3]. However, plaintiffs bear the burden to prove predominance. *CGC Holding Co.*, 773 F.3d at 1087.

law of five states cannot be said to illustrate a principle applicable to all fifty states, nor is a string cite included in one case sufficient analysis. Moreover plaintiffs' broad-brush approach overlooks relevant distinctions, particularly with respect to limitations or the effect of disclaimers. By way of example, Massachusetts, under which law plaintiffs previously asserted a statutory wage claim, requires a court to consider various factors to determine whether a personnel manual has become part of the employment contract, including whether the manual states that it provides guidance only and if the employer retained the right to unilaterally modify its terms. *See O'Brien v. New England Tel. & Tel. Co.*, 664 N.E.2d 843, 847-48 (Mass. 1996) (citing *Jackson v. Action for Boston Cmty. Dev., Inc.,* 525 N.E.2d 411 (Mass. 1988)). Florida courts, on the other hand, consistently hold that "in the absence of language in the employee manual expressly providing that the manual constitutes a separate employment agreement, or the parties' explicit mutual agreement to that effect, policy statements in the employment manual do not constitute the terms of a contract of employment." *Quaker Oats Co. v. Jewell*, 818 So. 2d 574, 578 (Fla. Dist. Ct. App. 2002).

Nor are the law review articles illustrative of a uniform principle. In fact, the Pederson article quotes another commentator to lament, "[t]here is currently no consistency in explaining the basis for the employee handbook exception to termination at will," Natalie Bucciarelli Pedersen, A Subjective Approach to Contracts?: How Courts Interpret Employee Handbook Disclaimers, 26 Hofstra Lab. & Employ. L.J. 101, 109 (2008) (alteration in original) (quoting Kelby D. Fletcher, The Disjointed Doctrine of the Handbook Exception to Employment At Will: A Call for Clarity Through Contract Analysis, 34 Gonz. L. Rev. 445, 465 (1998/1999)), and that "[t]his lack of consistency also extends to the disclaimer aspect of the handbook exception." *Id.*

Plaintiffs fail to satisfy their burden to demonstrate nationwide uniformity in the laws of the states with respect to employee handbooks as implied contracts. As recognized by the Fifth

Circuit, "[t]he party seeking certification of a nationwide class must . . . 'provide an 'extensive analysis' of state law variations to reveal whether those pose 'insuperable obstacles,'" and failure to do so is grounds for decertification. *Cole v. Gen. Motors Corp.*, 484 F.3d 717, 724 (5th Cir. 2007) (quoting *Spence v. Glock*, 227 F.3d 308, 313 (5th Cir. 2000)); *see also Gonzalez v. Family Dollar Stores, Inc.*, No. 03-535-JH-LFG, 2005 WL 8163793, at *7 (D.N.M. June 21, 2005) ("Variations in an array of areas, including elements of the claims, statutes of limitations, and the availability of damages, will far outweigh any such common elements. Though it is their burden to prove predominance, Plaintiffs gloss over this requirement. They have not provided the Court with a detailed, systematic analysis of the various applicable state laws at issue[.]").

In the alternative, plaintiffs contend that the court should apply the law of either Oklahoma or Georgia to the claims of all class members. [Doc. 165, pp. 27-28]. "Subject to constitutional limitations and the forum state's choice-of-law rules, a court adjudicating a multistate class action is free to apply the substantive law of a single state to the entire class." *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 561 (9th Cir. 2019) (emphasis added) (citing *Phillips Petroleum Co.*, 472 U.S. at 823). Thus, the court looks to Oklahoma's choice-of-law rules. *See also BancOklahoma Mortg. Corp. v. Capital Title Co.,* 194 F.3d 1089, 1103 (10th Cir. 1999) (federal courts exercising their supplemental jurisdiction over state law claims in a federal question lawsuit apply the choice of law rules of the forum state).

As recognized by the Oklahoma Supreme Court, Oklahoma's "established general choice-of-law rule for contract actions is bottomed on the terms of 15 O.S. § 162." *Bernal v. Charter Cty. Mut. Ins. Co.*, 209 P.3d 309, 315 (Okla. 2009). Pursuant to § 162, "[a] contract is to be interpreted according to the law and usage of the place where it is to be performed, or, if it does not indicate a place of performance, according to the law and usage of the place where it is made." Okla. Stat.

tit. 15, § 162. Thus, under Oklahoma law, "unless the contract terms provide otherwise, the nature, validity, and interpretation of a contract are governed by the law where the contract was made." *Harvell v. Goodyear Tire & Rubber Co.*, 164 P.3d 1028, 1033-34 (Okla. 2006).

Plaintiffs cite no specific provision in the Nuance Employee Handbook or other policies that explicitly identifies a place of performance, nor has the court identified any. Thus, the court must look to whether the parties implicitly indicated a place of performance. *See Panama Processes, S.A. v. Cities Serv. Co.*, 796 P.2d 276, 287-88 (Okla. 1990). Plaintiffs argue for the application of Georgia law because "[t]he policies, procedures, and decisions of [Nuance] resulting in underpayment of Plaintiffs' and Class Members' wages all emanated from the Atlanta, Georgia office" and "[a]ll of Defendants' actions underlying Plaintiffs' claims were orchestrated and performed in Atlanta, Georgia, including the collection and analysis of WebClock data, platform data, and payroll administration." [Doc. 165, pp. 29-30]. However, regardless of the polices' state of origin, the employees' respective state of residence constitutes the principal, or major, place of performance. *See Panama Processes, S.A.,* 796 P.2d at 287-88. The Employee Handbook and other communications prescribe rest break requirements and the applicable pay grade for transcriptionist work, which necessarily must be performed in the MLS employees' respective states of residence. Further, as employment contracts, the agreements to pay rest break time and bonus incentives were made in each MLS employees' state of residence. *See Lewis v. Energy Solutions, LLC,* No. CIV-12-1252-C, 2013 WL 3306151, at *2 (W.D. Okla. June 28, 2013) (quoting *Triad Transp., Inc. v. Wynne,* 276 P.3d 1013, 1016 (Okla. 2012) ("[A] contract is deemed to have been made where [the employee's] final assent to the offer is given."). Thus, Oklahoma choice-of-law principles do not permit uniform application of either Oklahoma or Georgia substantive law to the entire class.

For the foregoing reasons, determination of a common issue—whether defendants breached a contractual obligation to pay rest breaks and incentives—would first require hundreds if not thousands of individual legal inquiries to first determine the existence of an enforceable contract.  Thus, individual, rather than common, legal issues predominate and class certification is not warranted.  *See Clausnitzer v. Fed. Exp. Corp.*, 248 F.R.D. 647, 658 (S.D. Fla. 2008) ("Determining which jurisdictions permit a contractual claim based on the [employee handbook] provision is a question that must be addressed on an individual basis, or at the very least, by the creation of subclasses.  The issue of law Plaintiffs suggest predominates—that [defendant] breached its contractual obligation—cannot predominate over individual questions of law where the very terms of the contracts are an open question given the different treatment accorded to employee manuals by the fifty jurisdictions included in the proposed class."); *Cole*, 484 F.3d at 725-26; *Barrus v. Dick's Sporting Goods, Inc.*, 732 F. Supp. 2d 243, 254 (W.D.N.Y. 2010).

<u>Common Issues of Fact Do Not Predominate</u>

Class certification is not warranted for the additional reason that common issues of fact do not predominate.  Plaintiffs' claim requires a great deal of individualized proof to resolve factual issues.

As discussed above, in some jurisdictions, the existence of an implied contract based on employee manual or policy is an inherently factual inquiry to be determined based on a variety of factors.  *See, e.g., Jackson,* 525 N.E.2d at 412-13 (existence of contract is a question of fact to be determined based on evidence presented); *Russell v. Bd. of Cty. Comm'rs, Carter Cty.*, 952 P.2d 492, 502 (Okla. 1997) (existence of implied contract based on employee personnel handbook is a question of fact).

Further, to determine whether defendants breached the contract, the court must determine that each class member took an unpaid rest break or was entitled to an incentive payment that he or she did not receive. Again, this process would be very fact-specific and individualized.

With respect to rest breaks, plaintiffs argue that the inquiry is subject to uniform determination because the breach may be proven through evidence common to the entire class—specifically, defendants' WebClock and payroll data. [Doc. 165, pp. 39-40]. However, as more fully discussed in this court's February 14 Order, the evidence demonstrates putative class members' conduct under the rest period policy differed significantly. [Doc. 170, pp. 8-10]. Plaintiffs' own analysis is illustrative:

> Unpaid rest break time can be identified by assuming if someone was clocked-in to WebClock for the requisite time under the policy, the MLS took the allotted rest breaks. If the MLS punched-out to take their rest break, the WebClock punches will show a gap between punches, and if less than 20 minutes, it is counted as a rest break. Since Server Variance time includes time spent in rest breaks and additional non-productive time, Server Variance time up to the allotted rest break time under Nuance policy can be counted as rest break time. If an MLS did not take a rest break, then their Server Variance Time should be only 20 minutes under Nuance policy, and this can be confirmed through available data.

[Doc. 165, p. 41].[7] Thus, under plaintiffs' proposed approach, the court would be required to: (1) ascertain whether the class member took rest breaks, a determination likely dependent on individual deposition testimony; (2) for those class members who took rest breaks, ascertain whether the class member remained clocked in or clocked out for those breaks—again, a determination likely dependent on individual deposition testimony; (3) examine Server Variance

---

[7] Significantly, in reply, plaintiffs adopt a notably different approach and argue that "[a] reasonable jury could find that Nuance's declaration that Plaintiffs and the Class are *entitled* to paid rest breaks upon working a certain number of hours imposes no duty to actually take nor record rest breaks in a certain way; the accrued paid break time must still be paid." [Doc. 172, pp. 8-9]. The court does not consider arguments raised for the first time in reply.

time for each individual class member to determine whether the Server Variance Time includes only rest break time, or other non-productive time; and (4) confirm the rest break time through unidentified "available data." Plaintiffs' claim requires the members of the proposed class to present evidence that varies from member to member and therefore individual questions, rather than common questions, predominate. *See Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016).

As for the incentive payment claims, plaintiffs offer little argument with respect to resolution of common questions through common evidence. Rather, it appears that the court would be required to comb through the class members' WebClock entries to compare the entries to the class members' payroll records to determine what payments were made and if additional incentive monies were owed. Thus, plaintiffs' claim requires individualized proof and therefore they cannot satisfy Rule 23(b)(3). *Doyel v. McDonald's Corp.*, No. 08-CV-1198-CAS, 2010 WL 3199685, at *5 (E.D. Mo. Aug. 12, 2010).

To the extent that plaintiffs contend that they are entitled to an "*Anderson* presumption" with respect to either theory, plaintiffs are entitled to a "reasonable inference" as to the extent of damages only after plaintiffs meet their initial burden of proving that they performed work for which they were not properly compensated. *See* [Doc. 170, p. 11 n.12 (citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946))]. Further, plaintiffs must produce "sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Anderson*, 328 U.S. at 687. In *Anderson*, plaintiffs relied on representative sampling. *Id.; see also Tyson Foods, Inc.,* 136 S. Ct. at 1047. Here, the parties conducted discovery with respect to a representative sampling of potential class members, but, as more fully discussed by the court in its February 14 Order, the evidence revealed disparate factual circumstances. *See* [Doc. 170, pp. 6-

13]. Thus, the potential class members' experiences bore little relationship to each other, and the experiences of those employees are not probative of the class as a whole. *See Tyson Foods, Inc.*, 136 S. Ct. at 1048. Nor do plaintiffs offer any expert evidence common to the class to fill the evidentiary gaps created by defendants' alleged failure to maintain adequate records. For these reasons, plaintiffs have not made the initial showing under *Anderson* to shift the burden to defendants to come forward with more specific evidence.

Based on the evidence presented, the court finds that questions affecting only individual members predominate over any questions of fact common to law class members and therefore class certification is unwarranted.

### A Class Action is Not Superior to Other Available Methods

Plaintiffs must also show that a "class action would be 'superior to other available methods for fairly and efficiently adjudicating the controversy.'" *Menocal*, 882 F.3d at 915 (quoting Fed. R. Civ. P. 23(b)(3)). The superiority requirement is satisfied when a class action would allow for the "vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all." *Id.* (quoting *Amchem*, 521 U.S. at 617). Matters pertinent to the issue include: (a) the class members' interests in individually controlling the prosecution or defense of separate actions; (b) the extent and nature of any litigation concerning the controversy already begun by or against class members; (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (d) the likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3).

Here, plaintiffs fail to show that defendants have any connection to Oklahoma, the particular forum, beyond employing at least one MLS employee to work remotely in this state. *See Gonzalez*, 2005 WL 8163793, at *7. Further, as discussed above, due to the individual factual

inquiries necessary to establish liability, "a multitude of minitrials will be necessary to dispose of individual claims," rendering the class action form unmanageable and undermining the purpose of Rule 23.  *Smith v. MCI Worldcom, Inc.*, No. 99-CV-681-H, 2000 WL 36726436, at *8 (N.D. Okla. Mar. 31, 2000); *Doyel*, 2010 WL 3199685, at *9.  Thus, plaintiffs fail to demonstrate that the class action is a superior method of adjudication, and class certification is inappropriate.

**IV.   Conclusion**

WHEREFORE, the Motion for Certification of a Class Under Federal Rule of Civil Procedure 23 [Doc. 165] is denied.

IT IS SO ORDERED this 7th day of May, 2020.

GREGORY K. FRIZZELL
UNITED STATES DISTRICT JUDGE